410 So.2d 1230 (1982)
Bruce CHAMPION, Jr., et al., Plaintiffs & Appellees,
v.
PANEL ERA MANUFACTURING COMPANY, et al., Defendants & Appellants,
v.
KAISER ALUMINUM & CHEMICAL CORPORATION and Mosinee Paper Corporation, Third-Party Defendants & Appellees.
No. 8428.
Court of Appeal of Louisiana, Third Circuit.
February 3, 1982.
Rehearings Denied March 24, 1982.
*1233 Porteous, Taledano, Hainkel & Johnson, William A. Porteous, III, New Orleans, for defendants-appellants.
Trimble & Associates, Harry F. Randow, Alexandria, Mayer, Smith & Roberts, Alex F. Smith, Jr., Shreveport, for defendants-appellees.
Gahagan & Gahagan, Henry C. Gahagan, Jr., Brittain & Williams, Jack O. Brittain, Natchitoches, for plaintiffs-appellees.
John G. Williams, Natchitoches, for intervenors.
Before CULPEPPER, FORET and CUTRER, JJ.
CULPEPPER, Judge.
This is a products liability case. Plaintiffs and intervenors are the owners of chicken houses. They seek damages caused by allegedly defective insulation material used on the roofs of their houses. The original petition was filed August 29, 1978 by 21 chicken house owners against Panel Era as the finished product manufacturer, Kaiser Aluminum & Chemical Corporation, manufacturer of the aluminum foil component used in the insulation, various building contractors who had built poultry houses for the plaintiffs, and the manufacturers of the corrugated metal roofing used in the houses. A petition of intervention was subsequently filed by two more chicken house owners. Mosinee Paper Corporation and Diamond Alkali Company, manufacturers of other components of the insulation, were named as additional defendants by amending and supplemental petitions. On March 4, 1980, a supplemental and amending petition was filed by the plaintiffs to add as a defendant American States Insurance Company, an Indiana corporation, the alleged products liability insurer of Panel Era. American States answered, denying coverage, and, alternatively, made a third party demand against Kaiser and Mosinee for indemnity and/or contribution. Panel Era filed a third party demand against American States on the coverage issue.
All defendants except Panel Era, American States, Kaiser and Mosinee were eventually granted summary judgments or judgments of dismissal. Kaiser and Mosinee settled with the plaintiffs and were thereafter released as principal defendants.
When plaintiffs learned that the defendant, American States Insurance Company, was merely the excess insurer of Panel Era, further pleadings were filed to add as primary insurer American States Insurance Company of Texas, which in turn filed a third party demand against Kaiser and Mosinee. The insurers, hereinafter referred to as "American States", filed an exception of no right or cause of action on the grounds that since this is an action in contract, not tort, the insurers cannot be sued by direct action. This exception was denied at a hearing held October 9, 1980. At the same time, the trial court ruled that the settlement agreements between plaintiffs and the previously released defendants, Kaiser and Mosinee, were inadmissible as evidence at trial before a jury.
At the time of trial, the parties were aligned in the following manner:
*1234 1) Principal demand: Plaintiffs and Intervenors v. Panel Era, American States of Texas, and American States.
(2) Third party demands:
(a) Panel Era v. American States of Texas and American States (coverage issue).
(b) Panel Era, American States of Texas, and American States v. Kaiser and Mosinee (indemnity and/or contribution claim).
A lengthy trial by jury was held, resulting in a verdict on the principal demand in favor of the plaintiffs and intervenors and against Panel Era, American States of Texas and American States. The verdict on the first third party demand was in favor of Panel Era and against American States of Texas and American States. On the second third party demand for indemnity or contribution, the verdict was in favor of Kaiser and Mosinee and against American States. Judgment was rendered pursuant to this verdict. The defendants, American States of Texas and American States, appealed. Plaintiffs and intervenors answered the appeal, seeking increases in the damages and in the attorneys' fees for services rendered on appeal.
The following issues have been raised for our consideration: (1) Do the plaintiffs have a right of direct action against American States under LSA-R.S. 22:655, and, if so, did their tort action prescribe before sued upon? (2) Is there coverage under the policies issued to Panel Era by American States? (3) Should coverage have been denied for the claims of the intervenors by reason of Panel Era's delay in notice? (4) Should the settlement and hold harmless agreements executed by plaintiffs and intervenors with Panel Era, Kaiser and Mosinee have been admitted as evidence before the jury? (5) Did the amount of damages awarded by the jury constitute an abuse of discretion, and was there double recovery by plaintiffs and intervenors for the purchase price of the insulation? (6) Should the defendants receive a credit for use of the insulation up until the date of trial? (7) Did the court err in absolving Kaiser and Mosinee from any and all liability to insurers for plaintiffs' damages? (8) Should the letter to the defendant by plaintiffs' attorney have been admitted into evidence as an admission by one of the parties? (9) Were the expert witness fees excessive? (10) Should the award of attorneys' fees be increased?
GENERAL FACTS
Panel Era's product has the tradename "Insul-Sheath". It obtains from Kaiser Aluminum rolls of thin aluminum foil, to which is glued on one side a flame-retardant kraft paper, obtained by Kaiser from Mosinee. This bonded foil and paper is used by Panel Era as the outside walls of Insul-Sheath, with the foil on the outside. The rolls are fed through a machine that adds a polyurethane core in a gaseous form between the outside walls. This gas is expanded by heat to a width of approximately one inch. It then solidifies and constitutes the insulating material between the outside walls. The Insul-Sheath is then cut into sheets of various dimensions.
When Panel Era first started making Insul-Sheath it used a paper which was not flame-retardant. Later it started using a fire-resistant paper. The flame-retardant characteristic was derived from water soluble chemicals impregnated in the paper purchased by Kaiser from Mosinee. The switch to a flame-retardant paper was made because Panel Era felt that such a characteristic would be an additional selling point for its product. The president of Panel Era, Frank Roberts, testified the company performed no product testing nor chemical analysis to determine the compatibility of the chemicals producing the flame-resistant feature with the known construction uses of the finished product in buildings with tin roofs.
In order to expand its poultry-producing capacity, Country Pride Foods, Ltd. began during 1977 to solicit contract growers in Natchitoches Parish to build large scientifically designed chicken houses. Its expansion coordinator, Wayne Babin, provided each grower with Country Pride's written recommendations for the size, location and *1235 approved building materials for the poultry houses. Panel Era's sales manager met with Babin in Natchitoches in July, 1977 to examine the chicken houses during construction to see if their product would be suitable.
The houses were "A-frame" structures measuring 32 feet in width by one of three different lengths. The studs and rafters were either wood or metal. The sheets of Insul-Sheath were nailed directly on top of the rafters, with the aluminum foil up. The galvanized metal roofing was then nailed directly over the insulation. After viewing the method of construction, Panel Era's representative gave express assurance that its product would be suitable. The Insul-Sheath was then listed by Country Pride as acceptable for use in construction by its poultry growers.
The plaintiffs began to notice corrosion of the galvanized metal in various houses in April of 1978. Mr. Babin of Country Pride was informed of the problem and subsequently confirmed that it was limited to those growers whose houses had been constructed using the Panel Era insulation.
The cause of corrosion was established through testing by experts in chemistry and metallurgy. The fire-resistant chemicals in the Mosinee paper were dissolved by moisture from various sources, including rain water leaking through nail holes, condensation of water along the under side of the metal chicken houses, and the mere presence of high humidity sucked into the core of the insulation through "capillary action" of the polyurethane. The corrosion occurred when the dissolved chemicals came in contact with the zinc exterior of the galvanized tin roofing, causing the zinc to dissolve and the tin to rust. Holes around the roofing nails rusted, the roof leaked, the foil and paper came apart and the insulation fell down inside the houses.
There was no warning by any of the three manufacturers involved as to the possible corrosive effects of these chemicals in conjunction with metal and humidity.
Panel Era was notified of the corrosion problem in April, 1978. This suit was filed in August, 1978. However, American States of Texas was not formally notified of the claim until August, 1980, when this insurer was added as a defendant by supplemental and amending petition.
RIGHT OF DIRECT ACTION AGAINST INSURERS
Defendant-insurers contend the trial court erred in overruling its exception of no right or cause of action, since the direct action against insurance carriers provided for by LSA-R.S. 22:655 is available only in tort actions. They claim that until after the hearing on this exception, plaintiffs had only alleged a cause of action in redhibition, and first alleged a cause of action based on tort in an amending and supplemental petition filed October 9, 1980. They argue that, by this time, plaintiffs' tort action had prescribed, leaving only a cause of action in redhibition, which may not be pursued against them directly.
The plaintiffs contend, of course, that the trial court ruling was correct since the buyer of a defective thing can claim damages under theories of either redhibition or tort and is not required to plead the theory of the case. Plaintiffs further argue that since the facts set out in the original petition are sufficient to state a cause of action in tort, their tort action did not prescribe because the subsequent amendment of the petition relates back to the date of the filing of the original petition, under LSA-C.C.P. Article 1153 which states:
"When the action or defense asserted in the amended petition or answer arises out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading, the amendment relates back to the date of filing the original pleading."
We agree with plaintiffs and intervenors.
Direct actions authorized by LSA-R.S. 22:655 are limited to torts liability only. They are not authorized in actions resulting from breach of contract. LaCour v. Merchants Trust & Savings Bank, 153 So.2d 599 (La.App. 4th Cir. 1963); Tyler v. Walt, 184 La. 659, 167 So. 182 (1936). However, *1236 as the First Circuit stated in Gray & Company, Inc. v. Ranger Insurance Company, et al., 292 So.2d 829 (La.App. 1st Cir. 1974):
"In any case involving an obligation, liability must result from a breach of duty, whether the duty arises out of the undertakings of the parties, from their voluntary acts, by operation of law or otherwise. It is entirely possible that the same duty might have more than one source, as in the case of the negligent breach of a contractual obligation, in which case a cause of action arises from both the breach and the negligence. One set of circumstances might produce multiple duties arising from multiple sources."
Under our system of fact pleading it is ordinarily not necessary for a party to characterize his cause of action or state the theory of his case. He is entitled to relief under any theory of law which may be justified under the relevant facts properly proven at trial. LSA-C.C.P. Articles 862, 2164; Gray & Company, supra; Dean v. Hercules, Inc., 314 So.2d 430 (La.App. 1st Cir. 1975); writ granted 318 So.2d 55 (La. 1975); Veazey v. W. T. Burton Industries, Inc., 407 So.2d 59 (La.App. 3rd Cir. 1981).
In the recent case of Philippe v. Browning Arms Company, 395 So.2d 310 (La.1980), on rehearing the Louisiana Supreme Court stated:
"While C.C. arts. 2315 and 2316 are the fountainhead of tort responsibility, the court which determines tort responsibility in a particular case must decide the applicable standard of conduct by consulting the many other codal articles, statutes and law which provide for certain responsibilities according to the person involved or to the relationship or activities involved. Langlois v. Allied Chem. Corp., 258 La. 1067, 249 So.2d 133 (1971).
The court held that the appropriate standard of conduct in a suit by the purchaser of a defective thing is derived from the code articles on sales, and went on to say:
"[14] There is no compelling reason to require a person injured by a defective product he has purchased to proceed either in contract or in tort. The seller's (manufacturer's) act of delivering a defective thing, when he knows of the defect, gives rise to delictual, as well as contractual, liability. (citations omitted)
"[15, 16] We conclude that the right and the extent of recovery by the purchaser of a thing against the seller or manufacturer is governed by the codal articles providing for responsibility in the seller-purchaser relationship, as applied through C.C. art. 2315."
It is therefore clear that the factual allegations of a petition for redhibition may also state a cause of action in tort, and indeed the trial judge here correctly found that the claims could arise from redhibition, tort, breach of contract, negligence or products liability. Thus, the exception of no right or cause of action was properly overruled, as was the exception of prescription, since the original petition properly stated a cause of action in tort.
COVERAGE ISSUES
The next issue is whether the liability policies issued to Panel Era by American States of Texas and by American States provide coverage for the damage suffered by the plaintiffs and intervenors.
The first question is whether Panel Era's failure to give formal notice of the claim until long after this suit was filed voids the policy, as claimed by American States.
This presents a conflict of laws issue. Under Texas law, the failure to perform the condition of giving notice of the claim to the insurer as soon as practicable constitutes an absolute defense to coverage, absent a waiver or other special circumstances. Breach of the condition voids policy coverage. Dairyland County Mutual Insurance Company of Texas v. Roman, 498 S.W.2d 154 (Tex.Sup.Ct.1973); Broussard v. Lumbermen's Mutual Casualty Company, 582 S.W.2d 261 (Tex.Civ.App.1979). The rule in Louisiana is that an insurer must prove actual prejudice in order to deny a claim on the basis of not receiving notification as stipulated in the policy contract. Fakouri v. Insurance Company of N. A., 378 *1237 So.2d 1083 (La.App. 3rd Cir. 1979); West v. Monroe Bakery, Inc., 217 La. 189, 46 So.2d 122 (1950).
The trial court applied the law of Louisiana, and the jury found that American States was not prejudiced as a result of the delayed notice. The insurer contends that Texas law should apply, and, alternatively, that the jury's finding of no prejudice was error. We find the trial court's holdings on these questions are correct.
Louisiana courts have now adopted the interest analysis approach in choice of laws with respect to both torts and contracts, in preference to the former rigid approach of applying the law of the place where the tort was committed or where the contract was executed. Jagers v. Royalty Indemnity Company, 276 So.2d 309 (La.1973); Sutton v. Langley, 330 So.2d 321 (La.App. 2d Cir. 1976), writ denied 332 So.2d 805, 332 So.2d 820; 333 So.2d 242 (La.1976); Succession of Dunhan, 359 So.2d 674 (La.App. 1st Cir. 1978).
We recognize that Texas has a certain interest in this issue of notice to the insurer and interpretation of the policy provisions, inasmuch as the policies involved were issued to a Texas manufacturer (Panel Era), one by a Texas insurer (American States of Texas), and the other by an insurer foreign to both Louisiana and Texas (American States, an Indiana corporation). The apparent purpose of the Texas rule on notice is protection of its insurers against collusive tactics on the part of their insureds and those with claims against them. However, we find no indication of such tactics in the instant case. Panel Era cooperated fully with American States in defending against Panel Era's liability to plaintiffs and intervenors.
Another consideration is that Texas also has an interest in protecting its manufacturing industry from suffering large losses for products liability claims which have been insured against, even by Texas insurers. As to the excess insurer, which is an Indiana corporation, Texas has even less interest in extending its rule on notice.
On the other hand, the plaintiffs and intervenors are Louisiana residents. The defendant manufacturer conducts substantial business in this State. In fact, that company sent its representative to Louisiana to solicit business here actively, and he was quite successful. It cannot be said that this insurer was not aware that such interstate transactions would be and did take place when it issued the policy, especially since it conducted a yearly audit of the Texas manufacturer. Thus, the contemplation of the parties to the insurance contract must have been that it would have effect in any state in which the manufacturer did business and was potentially liable for damages due to doing such business. The insurer surely did not anticipate that only Texas law would be applicable to the insurance contract issued to such a business.
The focus of the Louisiana rule requiring proof of actual prejudice is to prevent insurers from using the notice requirement to evade the fundamental protective purpose of the insurance contract and to assure payment of liability claims up to the policy limits for which they collected premiums. Fakouri, supra; Miller v. Marcantel, 221 So.2d 557 (La.App. 3rd Cir. 1969). Thus, the Louisiana interest underlying its rule involves not only protection of its insured residents, but protection of Louisiana plaintiffs and the general public as well. From a comparison of the Texas interest with the Louisiana interest in protecting those who are damaged within its borders and those who do business within its borders, and in light of the reasonable contemplation of the parties, we conclude that Louisiana's notice rule should apply.
American States contends that it suffered actual prejudice by reason of the fact that it was not given the opportunity to participate in pretrial discovery which took place prior to the time of actual formal notice. The record shows, however, that ample opportunity was afforded American States to re-take any depositions which had already been taken, or pursue any other discovery deemed necessary by counsel. They had at least seven months in which to *1238 prepare their case. As they chose to accept the discovery as already taken, and had ample time in which to prepare a case, it cannot be said that the delay in notice prejudiced them in this regard. The only indication of possible harm was the self-serving testimony of the company's claims representative that the insurer would possibly have tried to mitigate damages and would have told Panel Era not to give the intervenors a guarantee. In light of the fact that the company ultimately denied coverage, the first claim is highly improbable. The claim with regard to the guarantee also carries little weight, since Panel Era gave it shortly after the problem first arose, in the good faith belief that it was not their product which was causing the corrosion. The jury clearly felt, as do we, that this testimony deserved little weight, and found as a fact that there was no showing of actual prejudice. We discern nothing clearly wrong in this finding.
Defendants also rely on four standard policy exclusions to deny coverage, each of which appears in both the general liability policy and the umbrella policy. The first of these has been called the "sistership exclusion", which precludes coverage for damages claimed for the withdrawal, inspection, repairs, replacement or loss of use of the insured's products, if such products are withdrawn from the market. Panel Era's expert witness in linquistics and grammar testified that the first preferred meaning of withdrawal is to "take back", and is considered synonymous with the word "recall", rather than a mere discontinuation of the sale of the product. American States argues that the Insul-Sheath product was withdrawn from the market since Panel Era stopped selling it sometime after the corrosion problem arose.
This exclusion has been taken to mean simply that the insurer is not liable for cost of preventive or curative action taken by its insured in connection with the recall of products discovered to have a common fault. Yakima Cement Products Company v. Great American Insurance Company, 22 Wash.App. 536, 590 P.2d 371 (1979). We do not feel the actions of Panel Era in this case constitute a withdrawing of the product from the market, as that term is commonly construed. However, even if that were the case, the damages claimed here are not in connection with the withdrawal of the product. These are damages caused by a defective condition, the discovery of which occasioned the discontinuation of the product. Therefore, the exclusion in question is not applicable here.
The next clauses relied on exclude from coverage property damage to work performed by or on behalf of the insured, or damage to the insured's product. These clearly do not apply as the property damage here was to the roofs of the chicken houses, not merely to the insulation, nor was there any damage to any work performed by Panel Era or on its behalf.
The last exclusion claimed applicable by American States reads:
"This insurance does not apply:
"(m) to loss of use of tangible property which has not been physically injured or destroyed resulting from
(1) * * *, or
(2) The failure of the named insured's products ... to meet the level of performance, quality, fitness or durability warranted or represented by the named insured;" (emphasis supplied)
This will not serve to exclude coverage for the damage which has occurred here, since there has been definite physical injury and destruction, not a mere loss of use of property.
American States makes a special argument as to coverage of the claims by the intervenors. The insurer argues that it suffered actual prejudice as a result of the delayed notice because, had they been notified of the claim immediately, the insurer would not have allowed the insureds to make to the intervenors a written guarantee of its product in the face of the known problems involving that product. While it is logical to assume that American States would have advised its insured not to guarantee the product, if it had known of the *1239 claims, this does not prove that Panel Era would have followed the advice. Furthermore, the mere testimony by an American States' representative that this is what they would have done does not serve to prove by a preponderance of the evidence that the insurer could have escaped liability under the policy for the intervenors' claims. We therefore hold that the jury was not clearly wrong in finding that no actual prejudice was suffered by the insurer with regard to the intervenors' claims.
ADMISSIBILITY OF SETTLEMENT AGREEMENTS
Kaiser and Mosinee settled the claims of plaintiffs and intervenors against them well before trial of this matter, and they were dismissed as principal defendants. They remain parties to the suit solely by virtue of the third party claims against them by American States and Panel Era. Their position as third party defendants was clearly explained to the jury by counsel for the plaintiffs and intervenors. The trial court refused to allow introduction by American States of the settlement agreements as evidence. The insurers now claim this was error because the jury should have been informed of the reasons Kaiser and Mosinee did not actively contest plaintiffs' claims.
Panel Era settled with the plaintiffs and intervenors during the trial. Plaintiffs agreed Panel Era's liability would be limited to $25,000 in the event that insurance coverage was not afforded it under the policy, and that plaintiffs could recover more than that amount only if insurance coverage was provided, and then only up to the amount of the coverage provided. Thus, Panel Era would not be exposed to any excess liability. It was further agreed that Panel Era would admit its product was used in the poultry houses.
American States argues that the agreement should have been revealed to the jury, and, because it was not, the jury was deceived. They contend that the agreement resulted in lack of incentive for Panel Era to contest the claims against it and adversely affected the jury's ability to evaluate the evidence and demeanor of the witnesses.
The general rule in Louisiana on admissibility of compromises and settlements was stated by this court in Broussard v. State Farm Mutual Automobile Insurance Company, 188 So.2d 111 (La.App. 3rd Cir. 1966);
"A compromise and discharge of one of two joint tort-feasors will restrict the claimant's recovery against the other tort-feasor to one-half, Harvey v. Travelers Insurance Co., La.App. 3 Cir., 163 So.2d 915, but the compromise itself is not admissible for the purpose of showing that the alleged co-tort-feasor was jointly negligent, while the amount of the compromise is relevant for no purpose.
"[22, 23] This is so because an earlier compromise or offer to compromise a disputed claim is not admissible to establish liability upon the claim, if objected to by a compromisor or offeror who is a party to the suit in which the compromise or offer is sought to be introduced into evidence. * * * The basic reason for this privilege of preventing admissibility is the policy danger of discouraging compromises, favored by laws, if they can be used adversely to the compromiser in other proceedings."
The cases relied on by American States involve jointly and/or solidarily liable co-defendants. In Daniel v. Penrod Drilling Company, 393 F.Supp. 1056 (W.D.La.1975), the settling defendant participated at trial but agreed not to aggressively defend the suit. In Ward v. Ochoa, 284 So.2d 385 (Fla.1973) and Leger v. Drilling Well Control, Inc., 69 F.R.D. 358 (W.D.La.1976), the settling defendants stood to have their liability reduced by an increase in the liability of the co-defendant. In these cases, it was held that an unfairness resulted because the jury was unaware of the true alignment of the parties. Therefore, it was concluded that the agreements should have been revealed at trial, so that the jury would be able to make a fair evaluation of the true stance of each party and his witnesses. This was especially important in Leger where the settling defendant was not *1240 present at trial, but the key witnesses were its employees.
In the instant case, however, we think the true alignment of the parties was clear to the jury. With respect to Kaiser and Mosinee, the jury was well aware that the plaintiffs and intervenors were not pursuing a claim against them. Therefore, the lack of a vigorous defense to the plaintiffs' case did not deceive the jury. It is true that the key witnesses on the issue of their liability to American States for indemnity and contribution were their own employees. However, since the testimony introduced was in the form of depositions taken before settlement, the agreement could have had no prejudicial effect on it.
As regards the agreement limiting Panel Era's liability to the plaintiffs and intervenors, we feel that here also to allow its submission to the jury would have defeated the policy of encouraging compromise and settlement. The jury was well aware that American States and Panel Era were adverse to each other on the coverage dispute. Furthermore, counsel for Panel Era and its officers and employees cooperated fully with American States throughout the entire suit. While it is true that, as in Ward, supra, and Leger, supra, Panel Era would have its maximum liability reduced or eliminated by a finding against its co-defendant, American States, the situation here does not produce unfairness because this is a normal incident of the insurer-insured relationship, not merely the result of an agreement between it and the plaintiffs. The agreement to admit that the Panel Era product was used in the chicken houses also makes no difference, as this was quite easily shown by a preponderance of the evidence at trial to the jury's satisfaction. Thus, we find in the present case none of the potential unfairness pointed to in the cases relied on by the defendants. We find no error by the trial judge in applying the general rule that such agreements are inadmissible.
QUANTUM
With respect to computation of damages, the defendant contends that the award of $1.75 per square foot for repair to the chicken houses is not supported by the evidence in the record. The plaintiffs contend the award is too low, since the only precise estimation by an expert of the cost of repair was $2.20 per square foot. Plaintiffs argue the award should be increased to that amount.
Defendants rely principally on the testimony of one of the builders of these poultry houses to the effect that ten good workers could put on a new roof in as little as one day. Plaintiffs' expert estimated that it would take a crew of six to eight workers some two and one-half to three days to install a new roof. Most of the testimony was to the effect that it would probably take longer to remove the old roof and prepare the beams for the new roof than it would to put on the new roof. Plaintiffs' expert estimated 18 hours for demolition. In light of the fact that the labor estimated by plaintiffs' expert was shown on cross-examination to be somewhat inflated, and the testimony as to the length of time required which defendant relies on is somewhat unrealistic, we find that the jury award of $1.75 per square foot is amply supported by the record. Certainly, there is no abuse of discretion by the jury in its award for the cost of repairs.
Defendant also contends that the plaintiffs and intervenors are not entitled to recover their purchase price of the insulation, since they were awarded an amount for the repair and replacement of the roof as a whole, including the insulation. With this contention we agree.
The object of the provisions governing redhibitory vices is to restore the purchaser, as much as possible, to the condition he enjoyed prior to the sale. Alexander v. Burroughs Corporation, 359 So.2d 607 (La.1978). Thus, where a defendant is obliged to replace the defective item in connection with the repair of the damage caused by the defective condition, the plaintiff is not entitled also to recover the purchase price of the defective thing. See Fox v. American Steel Building Company, Inc., 299 So.2d 364 (La.App. 3rd Cir. 1974); Busenlener *1241 v. Peck, 316 So.2d 27 (La.App. 1st Cir. 1975). Since the money damages awarded for demolition and reconstruction of the roofs of the chicken houses takes into account the cost of replacing the defective insulation, a return of the purchase price would result in double recovery for the cost of the insulation. The judgment appealed must be amended to delete the award to each plaintiff and each intervenor for the purchase price of the insulation as itemized by the jury.
CREDITS
Defendants further claim that they are entitled to a credit for the use of the roof and insulation up until the time of the trial, inasmuch as the chicken houses had been in operation the entire time with no loss of income. We recognize that where a plaintiff has derived benefit from the use of a product, even though it is defective, Louisiana courts have allowed the seller a credit for such use. Alexander v. Burroughs Corporation, supra. However, as the record is totally devoid of any evidence to establish the value of the benefit to the plaintiffs and intervenors by their use of this insulation, no credit can be awarded here.
THIRD PARTY CLAIM AGAINST KAISER AND MOSINEE
The jury found that neither of the third party defendants was at fault in causing the damage to plaintiffs and intervenors, and that they were not liable for reimbursement to Panel Era or American States of any amount assessed against them in damages. American States contends that this finding is in error and that the Kaiser and Mosinee products were defective and were the sole cause of the damages. In the alternative, they argue that Kaiser's and Mosinee's products contributed to the defective condition of Panel Era's product and American States should receive contribution and/or indemnification from them.
It was shown at trial that the corrosion was caused by the chemicals in the fire-resistant paper, when they dissolved by the moisture entering the core of the Insul-Sheath. The chemicals leeched out of the paper in part through the pinholes in the aluminum foil to reach the tin on the top, and in part through nail holes in the insulation. Moisture entered the insulation material partly through the pinholes in the foil and partly through the nail holes, as well as through the exposed outer edge of the insulation.
These component parts of the insulation were furnished by Kaiser, and in turn by Mosinee, according to the direct specifications from Panel Era employees. The foil-kraft paper laminate was to conform both to written specifications and to a sample given to the Kaiser representative by the Panel Era representative. Panel Era wanted a product comparable to the sample shown to Kaiser at a comparable price. They asked for a .0003 gauge aluminum foil. There was testimony that this is such a thin gauge that pinholes cannot possibly be avoided. In any event, even if there had been no pinholes, moisture also entered the insulation via nail holes and the outer edge, so that the chemicals would have dissolved and corroded the foil and the tin anyway.
Neither of the component manufacturers provided a warning that the chemicals which imparted a fire-resistant feature were water-soluble and would corrode metal with which they came in direct contact. However, Kaiser, as the direct supplier of Panel Era, was only aware that the end product was to be used in double-walled construction where there would be no direct contact with any type of metal. This, then, was the normal and intended use for which Kaiser furnished its foil-kraft paper product. The insulation has never produced any problem when used in such construction, even in metal buildings. Thus, it may be said that the foil-kraft paper laminate was safe and suitable for the use intended by Kaiser.
Moreover, the ultimate responsibility for determining whether the end product or its components will be safe and suitable for the purpose for which it is finally sold lies with the finished product manufacturer. He is held to a duty of reasonable care in selection *1242 of components, which is something more than mere inspection. His technical knowledge should be sufficient to enable him to select material, the use of which will secure a safe finished product. He should use reasonable care to ascertain the material out of which the other manufacturer's part is made and the plan under which it is made, and have sufficient technical knowledge to form a reasonably accurate judgment as to whether these are such as to secure a safe finished product. See Restatement of Torts, 2d, Sec. 395. Considering all of the foregoing, we find no manifest error in the jury's holding that the principal defendants are not entitled to contribution or indemnity from Kaiser or Mosinee.
PLAINTIFFS' LETTER OF ADMISSION
Defendants-appellants also attempted at trial to introduce a letter, written by counsel for the plaintiffs to counsel for Panel Era, as an admission by one of the parties. The text of the letter informed the appellants' attorney of the developments in the case from the beginning up to the time he became involved therein. It also contained counsel's representation as to the amount of actual damages sustained by his clients and his legal opinion as to which parties should be ultimately liable. American States contends that the trial court's refusal to admit the letter was error, since it constitutes an admission on behalf of the attorney's clients. The trial court found that the letter was prejudicial, by reason of the many strong opinions contained therein, and confusing to the jury, because of the numerous party defendants involved in the suit at that point, which were subsequently released before the trial. We find, for the same reasons as expressed by the trial judge, that exclusion of this evidence was proper under the circumstances.
EXPERT WITNESS FEES
American States also argues that the expert witness fees assessed by the trial court are excessive. In light of the evidence in the record as to the expertise of each witness, and the time spent by each on the case, we find no abuse of discretion by the trial court in its awards.
ATTORNEYS' FEES
The next issue concerns attorney's fees. In Philippe v. Browning Arms Co., 395 So.2d 310 (La.1980), our Supreme Court held the purchaser of a defective product is entitled to both damages and attorney's fees from the manufacturer. On rehearing, the court states:
"The manufacturer of products introduced into commerce has the obligation to produce a product which is reasonably safe for its intended use. Weber v. Fidelity & Cas. Ins. Co., 259 La. 599, 250 So.2d 754 (1971). Breach of this obligation gives rise to a cause of action in favor of the purchaser of the product not only to demand the return of the purchase price, but also, because the manufacturer is presumed to know of defects in its products, to demand all damages caused by the defect and reasonable attorney's fees. C.C. art. 2545; Rey v. Cuccia, 298 So.2d 840 (La.1974).
Plaintiffs and intervenors have answered the appeal to request an increase in attorneys' fees for services rendered on appeal. In view of the extreme length of the record, the complexity and variation of the issues, and the relative difficulty of the case as a whole, we find that additional awards are warranted in the amount of $1,000 for plaintiffs and $1,000 for intervenors.
For the reasons assigned, the judgment appealed is amended to delete the awards to each plaintiff and to each intervenor for return of the purchase price of the insulation, itemized in the jury verdict as follows:

 "Cheryl Broadway $ 5,365.44 
 William F. Carter $ 5,786.73 
 James Clayton Manasco $ 7,335.93 
 Bruce Champion, Jr. $ 14,209.94 
 Kenneth Colston $ 12,874.41 
 Dewayne Dillard $ 9,602.61 
 Jack Dockens $ 6,437.21 
 Benny Funderburk $ 7,417.48 
 Kenneth Funderburk $ 7,104.97 
 Danny C. Hall $ 3,549.41 

*1243
 Larry L. Lambert $ 6,437.21 
 William Liles, Jr. $ 3,218.60 
 Sidney Lucius $ 7,136.63 
 Maurice Martinez $ 7,104.97 
 Crawford Mitchell $ 11,528.88 
 Richard B. Olive $ 22,803.58 
 Steve Rains $ 7,104.97 
 Robert C. Rachal $ 7,335.93 
 Charles Spears $ 9,689.46 
 Robert Strahan $ 7,545.10 
 J. A. Gibson $ 18,254.74 
 Edward Gibson $ 18,254.74 "

The judgment is also amended to increase the awards of attorneys' fees in the amount of $1,000 for plaintiffs-appellees and the amount of $1,000 for intervenors-appellees. Otherwise than as amended, the judgment appealed is affirmed at the cost of appellants.
AMENDED AND AFFIRMED.

ON APPLICATION FOR REHEARING
PER CURIAM.
The intervenors-appellees, J. A. Gibson and Edward Gibson, have filed an application for rehearing in which they point out that in our original opinion we made a clerical error in reducing the award to each intervenor by the sum of $18,254.74. Intervenors call our attention to the fact that in the trial court the original judgment of date November 3, 1980 awarded to each of the intervenors a sum which included $18,254.74 representing the purchase price of insulation material. This was the result of a clerical error by the jury. The total of the purchase prices of the insulation materials of both intervenors was actually the sum of $18,254.74, of which $6,134.89 was the purchase price paid by J. A. Gibson and $12,117.87 was the purchase price paid by Edward Gibson. Accordingly, the original judgment in the trial court was amended on February 2, 1981 to reduce the awards to the intervenors accordingly.
In our original opinion on appeal we erroneously used the purchase prices of the insulation materials as shown in the trial court's original judgment instead of that shown in the amended judgment, the result being that in our original opinion the award to each of the intervenors was reduced by the sum of $18,254.74. We should have reduced the award to J. A. Gibson by only the sum of $6,134.89 and the award to Edward Gibson by only the sum of $12,117.87.
Accordingly, we hereby amend our original opinion so as to reduce the trial court award to J. A. Gibson by only the sum of $6,134.89 and to reduce the trial court award to Edward Gibson by only the sum of $12,117.87. Subject to this correction of clerical error, the application of the intervenors for a rehearing is denied.