632 So.2d 1193 (1994)
Linda Joyce LONGO
v.
E.I. DUPONT DE NEMOURS & COMPANY and John N. Kent, D.D.S.
No. 93-CA-0756.
Court of Appeal of Louisiana, Fourth Circuit.
February 18, 1994.
*1194 Louis B. Merhige, Frank A. Milanese, Michael F. Somoza, New Orleans, for plaintiff-appellant.
Lawrence E. Abbott, Shelly Gilbreath Wells, Abbott & Meeks, New Orleans, and Barry Fish, Edward M. Mansfield, Lewis & Roca, Phoenix, AZ, for defendant-appellee.
Before BARRY, ARMSTRONG and JONES, JJ.
ARMSTRONG, Judge.
Plaintiff, Linda Joyce Longo, appeals from a trial court judgment granting a motion for summary judgment in favor of E.I. Dupont De Nemours & Company's ("Du Pont"). We affirm.
Du Pont is the manufacturer of a plastic resin, polytetrafluoroethylene or PTFE, which it sells under the trademark Teflon. Du Pont sold Teflon to numerous industrial manufacturers and also to several biomedical companies, including Vitek, Inc ("Vitek"). Vitek invented and manufactured a patented biomedical product with the trademark name Proplast. Dr. John Kent, an oral surgeon who worked as a consultant to Vitek, helped develop a temporomandibular joint ("TMJ") out of Proplast. Vitek manufactured the implant device. Dr. Kent placed one of the implants in plaintiff's jaw in May 1978. Plaintiff alleges that the first implant failed and Dr. Kent had to replace it with another in December 1982. Plaintiff further alleges that in February 1991, Dr. Kent determined that the Vitek prosthesis implanted in her in 1982 was defective. In April 1991 the Vitek prosthesis was removed and one of plaintiff's ribs was used to replace her right TMJ. Plaintiff also alleged that the deterioration of the Vitek prosthesis resulted in a hole in her skull and loss of a portion of her jawbone. These were repaired, and plaintiff underwent further surgical procedures necessitated by the deterioration of her jaw and skull.
*1195 Plaintiff subsequently instituted this action against Dr. Kent and Du Pont. The suit against Dr. Kent is not a part of this appeal. Du Pont filed a motion for summary judgment which was granted by the trial court. The court found there was "no duty owed by Du Pont to the plaintiff as a raw material supplier."
Under La.C.C.P. art. 966(A), a plaintiff or a defendant in the principal or any incidental action, with or without supporting affidavits, may move for summary judgment in his favor for all or part of the relief for which he has. Appellate courts review summary judgments de novo, under the same criteria that govern the district court's consideration of whether summary judgment was proper. Schroeder v. Board of Supervisors of Louisiana State University, 591 So.2d 342 (La.1991). La.C.C.P. art. 966(B) provides that summary judgment shall be rendered if the pleadings, depositions, answers to interrogatories, and admissions on file, together with supporting affidavits, if any, show there is no genuine issue of material fact, and the mover is entitled to summary judgment as a matter of law. Osborne v. Vulcan Foundry, Inc., 577 So.2d 318 (La.App. 4th Cir.1991).
Under La.C.C.P. arts. 966 and 967, however, the burden is upon the mover to show the absence of genuine issues of material fact. Frazier v. Freeman, 481 So.2d 184 (La.App. 1st Cir.1985). Courts must closely scrutinize the papers supporting the position of the mover, while treating the papers of the party opposing the motion indulgently. Ortego v. Ortego, 425 So.2d 1292 (La.App. 3d Cir.1982), writ den., 429 So.2d 147 (La. 1983). All doubts must be decided in favor of trial on the merits even if grave doubt exist as to a party's ability to establish disputed facts at trial. Osborne v. Vulcan Foundry, Inc., supra; Equipment, Inc. v. Anderson Petroleum, Inc., 471 So.2d 1068 (La.App. 3d Cir. 1985).
Attached to Du Pont's motion for summary judgment were a number of affidavits, reports on Proplast and portions of a deposition of Dr. Charles Homsy, the founder and former president of Vitek, Inc. Plaintiff filed a memorandum in opposition to Du Pont's motion for summary judgment but offered no affidavits, depositions, admissions, etc. One affidavit offered by Du Pont was that of John S. Lindell, a chemical engineer employed by Du Pont, who had been working with Teflon PTFE products since 1977. Lindell attested to a number of varied uses of products made with or containing PTFE, including parts in valves, quartz crystals for use in electronics, piston rings for use in navy submarines, wiring in jet aircraft, bearings in pianos, and antenna insulators used in satellites. All of these were industrial uses. The obvious social utility of PTFE was thus established by Lindell's affidavit.
In his February 5, 1992 deposition Dr. Charles Homsy stated that he founded Vitek, Inc. in 1969 to manufacture prostheses. Prior to the formation of Vitek Dr. Homsy was researching the use of Teflon for use in the manufacture of prostheses while serving as the director of the Orthopedic Prosthesis Laboratory at Methodist Hospital in Houston, Texas. In 1967 Dr. Homsy sought to purchase powdered Teflon (PTFE) for use in his research. In a March 13, 1967 letter to the purchasing agent of Methodist Hospital, Mr. C. Gonzalez, Du Pont advised that Teflon was an "industrial material" and was "not made for medical use." In the letter Du Pont warned that, "while we carry out such tests as are needed to protect the ordinary users of our products, we do not perform the detailed long-time studies which should be made before these products are employed for purposes such as in medicine and surgery."
Du Pont further advised Mr. Gonzalez of studies indicating, among other things, tissue reaction from abraded particles of PTFE. In a reply letter to Du Pont, Dr. Homsy briefly distinguished the studies cited by Du Pont. Du Pont sold Teflon to Methodist and Dr. Homsy only after they agreed to execute a disclaimer and assume full responsibility for "any consequences which may result directly or indirectly from [Teflon's] use."
Vitek invented and manufactured the compound Proplast, which it patented in 1976. Proplast is a registered trademark of Vitek. Vitek's 1976 patent application for Proplast details the manufacturing process for the *1196 product. Proplast is manufactured in a preferred composition for implantation consisting of "40 percent by volume fibrous carbon and 60 percent by volume" of Teflon or PTFE. The powdered Teflon and carbon are mixed with a solvent in a high speed mixer until a uniform slurry is produced. The slurry mix is then filtered to remove over eighty percent of the solvent. Following filtration the mix is placed in a heated press and compressed at levels of from 500 to 3,000 pounds per square inch, at a temperature between 100 and 250 degrees fahrenheit, until solvent levels are reduced to between six and ten percent by weight. The "cake" of material left after filtering is then run through rollers heated to between 100 and 250 degrees fahrenheit. The thickness of the cake is reduced to between 20/1000ths and 80/1000ths of an inch. The temperature of the rollers is then heated to between 320 and 360 degrees fahrenheit and the material is run through the rollers from four to eight times. The material is then sintered at a temperature from 610 and 680 degrees fahrenheit for periods from thirty minutes to several hours depending on the thickness of the stock.
In 1977, in response to a request from Vitek for assistance in getting Proplast approved by the Food and Drug Administration, Du Pont wrote Vitek, emphasizing again that Teflon was made for industrial purposes only, and that it marketed no medical or surgical grades. Dr. Homsy, as President of Vitek, signed and returned a "Statement of Policy" stating that he would conduct any clinical tests on humans in accordance with the Federal Food, Drug and Cosmetic Act.
Dr. Homsy stated that numerous studies done on Proplast implantations in animals and humans indicated no evidence of the type of problem encountered by plaintiff. Vitek manufactured and sold numerous and varied types of prostheses manufactured out of Proplast. Proplast was unique and desirable because it stimulated tissue ingrowth to anchor and stabilize prostheses.
Du Pont has attached to its motion for summary judgment numerous trial and appellate court decisions from other jurisdictions granting and upholding summary judgments in its favor in similar suits. None of these are from Louisiana.
Plaintiff alleges that Du Pont is liable under a theory of strict products liability, which is analogous to the principle of strict liability underlying La.C.C. arts. 2317-2322.[1] To recover from a manufacturer in strict products liability a plaintiff must prove (1) that the injury resulted from the condition of the product; (2) that condition made the product unreasonably dangerous to normal use; and (3) the condition existed at the time the product left the manufacturer's control. Cosse v. Allen-Bradley Company, 601 So.2d 1349 (La.1992); Halphen v. Johns-Manville Sales Corp., 484 So.2d 110 (La. 1986); Traut v. Uniroyal, Inc., 555 So.2d 655 (La.App. 4th Cir.1989). We will focus on the critical question of whether the product was unreasonably dangerous. If there is no genuine issue of material fact as to this element of plaintiff's burden of proof, and it is clear that Teflon was not unreasonably dangerous, then Du Pont was entitled to judgment as a matter of law.
In Halphen v. Johns-Manville, supra, the Louisiana Supreme Court set forth four classifications of unreasonably dangerous products: (1) products which are unreasonably dangerous per se; (2) products which are unreasonably dangerous in construction or composition; (3) products which are unreasonably dangerous because of their design; and (4) products which are unreasonably dangerous because the manufacturer fails to warn about a danger related to the way the product is designed. 484 So.2d at 113-115. We will examine each separately.
"A product is unreasonably dangerous per se if a reasonable person would conclude that the danger-in-fact of the product, whether foreseeable or not, outweighs *1197 the utility of the product." Halphen v. Johns-Manville, 484 So.2d at 114. We are looking not at the product Proplast, but at Teflon, or PTFE. Du Pont established that Teflon, or PTFE, is used in numerous types of products, the social utility of which are substantial. There is no showing of any danger-in-fact of Teflon. The record shows that the social utility of Teflon outweighs any danger-in-fact.
"A product is unreasonably dangerous in construction or composition if at the time it leaves the control of its manufacturer it contains an unintended abnormality or condition which makes the product more dangerous than it was designed to be." 484 So.2d at 114. It is not argued that the Teflon sold by Du Pont to Vitek was anything other than what it was designed to be. In fact, just the opposite is argued; that Teflon as normally manufactured by Du Pont caused the damage to plaintiff. The product was not defective in any way.
A product may be unreasonably dangerous because of its design if: (1) a reasonable person would conclude that the danger-in-fact, whether foreseeable or not, outweighs the utility of the product (this is the same as the test for unreasonably dangerous per se); (2) alternative products were available to serve the same needs or desires with less risk of harm; (3) even though the utility of the product outweighs its danger-in-fact, there was a feasible way to design the product with less harmful consequences. 484 So.2d at 115. We have already determined that Teflon is not unreasonably dangerous per se. It was established that Teflon is a unique product whose peculiar properties make it what it is. Based on the record and the nature of the product itself, there are no alternative products to serve the same needs or desires with less risk of harm. Again, because of its unique and peculiar qualities, there appears to be no question but that Teflon could not have been designed with less harmful consequences. If so, it would not have been Teflon.
A product may also be unreasonably dangerous if a manufacturer fails to adequately warn about a danger related to the way the product is designed. A manufacturer is required to provide an adequate warning of any danger inherent in the normal use of its product which is not within the knowledge of or obvious to the ordinary user. 484 So.2d at 114-115. In the instant case, the record shows that the danger to plaintiff might have been the design and manufacture of Vitek's Proplast and/or the implant itself, but not Du Pont's product, Teflon, which was incorporated into Proplast. It has been held in Louisiana, at least with regard to redhibitory defects, that:
The manufacturer of a non-defective, even though substantial, component of a thing assembled and created by another should not be liable to the buyer of that thing for redhibitory vices in the assembled and created thing. In this sense, the assembler or creator of the thing from component parts effectively becomes the manufacturer of the thing.
Austin's of Monroe, Inc. v. Brown, 474 So.2d 1383 (La.App.2d Cir.1985).
Teflon was a component part of Proplast and therefore Du Pont owed no duty to warn plaintiff. Vitek became the manufacturer. While Du Pont may have sold Teflon to Vitek knowing the possibility existed that products manufactured with Teflon as a component part would be used in medical and surgical applications, it had no control over the design, composition, testing or manufacture of Vitek products.
Defendant Du Pont met its burden of establishing that Teflon was not unreasonably dangerous and that it owed plaintiff no duty to warn. Therefore, there was no genuine issue as to any material fact and it was entitled to judgment as a matter of law. The trial court properly granted Du Pont's motion for summary judgment.
For the foregoing reasons, we affirm the judgment of the trial court.
AFFIRMED.
NOTES
[1] Plaintiff's cause of action arose prior to the enactment of the Louisiana Products Liability Act, La.R.S. 9:2800.51 et seq, which became effective September 1, 1988. The Act has been held not to apply retroactively. Gilboy v. American Tobacco Company, 582 So.2d 1263 (La. 1991); Page v. Gilbert, 598 So.2d 1110 (La.App. 4th Cir.1992), writ denied, 605 So.2d 1146, 1150 (La.1992).