Marilyn RYNDERS, Appellant,

v.

E.I. DU PONT, DE NEMOURS & COMPANY, a Delaware corporation. Appellee.

James W. BUHLER, Appellant,

v.

E.I. DU PONT, DE NEMOURS & COMPANY, a Delaware corporation. Appellee.

No. 93–1643.

United States Court of Appeals, Eighth Circuit.

Submitted Nov. 11, 1993.

Decided April 15, 1994.

---

Barry G. Reed, Minneapolis, MN, argued (Ronald S. Goldser, Minneapolis, MN, Jeffrey Viken, Rapid City, SD, David Strait, Watertown, SD, on the brief), for appellant.

Edward M. Mansfield of Phoenix, AZ, argued (Ross F. Schmucki, Barry Fish, and Michale O. Miller, Phoenix William Porter and Patricia Meyers, Rapid City, SD, on the brief), for appellee.

Before RICHARD S. ARNOLD, Chief Judge, BEAM, Circuit Judge, and JACKSON *, District Judge.

BEAM, Circuit Judge.

Marilyn Rynders and James Buhler brought this diversity products liability action against E.I. Du Pont, De Nemours & Company (DuPont), the manufacturer of certain polymers commonly known by their trade name, Teflon. Vitek, Inc. (Vitek), a now bankrupt medical supplies manufacturer, used Teflon to construct the cartilage replacement implants that injured both Rynders and Buhler. After a hearing, the district court [1] entered judgment as a matter of law dismissing all implied warranty claims and the jury returned a verdict for DuPont on strict liability and negligence claims. Rynders and Buhler appeal arguing that the verdicts and the court's judgment resulted from several misinterpretations of South Dakota law.[2] We affirm.

## I. BACKGROUND

Dr. Charles Homsy, a former DuPont research engineer, invented Proplast—a semi-soft, porous, spongy material—while doing prosthesis research at Methodist Hospital in Houston, Texas, in 1968. Homsy manufactured Proplast by combining polytetrafluoroethylene (PTFE Teflon), purchased from DuPont, with carbon, solvents and other ingredients. He employed a process of heating, compressing and drying this mixture to produce the semisoft Proplast material from the base ingredients. Homsy founded Vitek in 1969 to manufacture and distribute his Proplast prosthetic devices while he continued his research at Methodist Hospital. Vitek patented Proplast in 1976.

One of the devices Vitek sold was the Proplast Interpositional Implant designed to correct temporomandibular joint (TMJ) disorders. Vitek constructed the implant by molding Proplast into the required shape and laminating it with fluorinated ethylene propylene (FEP), a slippery polymer film, to protect the Proplast from wear in load-bearing joints such as the TMJ.[3] The FDA authorized the sale of Proplast TMJ implants in 1983. Rynders and Buhler both had Proplast implants surgically placed in their jaws by oral surgeons to correct TMJ disorders.

When Homsy first sought to purchase Teflon from DuPont for his prosthesis research, DuPont advised the purchasing agent of

---

* The HONORABLE CAROL E. JACKSON, United States District Judge for the Eastern District of Missouri, sitting by designation.

1. The Honorable Richard H. Battey, United States District Judge for the District of South Dakota.

2. All parties agree that South Dakota law governs the substantive issues in this case.

3. The parties dispute whether the FEP Vitek used was Teflon or a similar polymer produced by a company other than DuPont. We find it unnecessary to our decision to resolve this dispute.

Methodist Hospital through a March 13, 1967, letter that Teflon was an "industrial material" that was "not made for medical use." Appellants' App. at A–201. DuPont's letter also noted several past scientific studies indicating that PTFE implants wore badly and disintegrated in load-bearing joints, releasing PTFE particles into the body of the subject. These studies concluded that abraded PTFE particles from early prosthesis experiments caused severe foreign body giant cell reactions, resulting in granulomatous tissue and significant bone erosion. DuPont warned that its Teflon products are not tested for medical uses and stated that the Hospital must rely on its own judgment as to the material's safety. Finally, DuPont required the Hospital to execute a disclaimer accepting full responsibility for the consequences of its proposed use of Teflon.

Homsy responded to DuPont with a letter stating that his own research and more recent scientific studies had uncovered solutions to the problems with earlier PTFE implants. Id. at A–203–04. Homsy's letter also accepted all responsibility for testing PTFE Teflon for use in prostheses. Based on Homsy's letter and the Hospital's execution of the disclaimer, DuPont filled Methodist Hospital's order for Teflon.

DuPont again advised Vitek that it did not market surgical grades of Teflon in response to Vitek's request in 1977 for assistance in getting Food and Drug Administration (FDA) approval for Proplast. Id. at A–119–22. DuPont required Homsy, the president of Vitek, to sign a "Statement of Policy" declaring that he would conduct any clinical tests on humans in accordance with the Federal Food, Drug and Cosmetic Act. Id. at A–122. Homsy's research included correspondence with one of the scientists who had identified the previous PTFE implant problems, a review of the scientific literature on PTFE, and years of clinical studies with Proplast implants in animals and in humans. All of his experiences led Homsy to believe that Proplast was an "excellent implant material." Appellee's App. at 11. Indeed, the FDA advisory committee stated that "the safety and effectiveness of the material [Proplast] has been established through long-term clinical trials." 47 Fed.Reg. 2810, 2818 (1982). Unfortunately, the accolades for Proplast were premature.

An oral surgeon placed Proplast implants in both of Rynders' TMJs on October 23, 1985, to correct TMJ displacement problems that had caused Rynders chronic jaw pain and headaches. Rynders had the Proplast implants removed on January 6, 1988, at the recommendation of her oral surgeon, because she continued to suffer from TMJ problems. Upon removal, the surgeon observed that the implants were fractured and that the bony surfaces of Rynder's TMJs had eroded since the implantation operation. Transcript at 167–68. The surgeon further noted granulomatous tissue which he concluded was probably a foreign body reaction to the implants. Id. at 168. Rynders has subsequently undergone numerous surgical procedures in order to partially reconstruct her TMJs with bone fragments from her ribs and from her left hip. She continues to suffer from the deterioration of her jaw.

Buhler had Proplast devices implanted in both TMJs on June 14, 1984, to relieve pain, his inability to fully open his mouth, and clicking noises in his jaw that he experienced after an automobile accident. Although Buhler was asymptomatic after his surgery, his oral surgeon warned him on September 6, 1990, of evidence that the implants might cause bone resorption and that this problem may not manifest itself in outward symptoms. Subsequent tests revealed that Buhler had suffered bone deterioration in his TMJs and also revealed granulomatous formations. Transcript at 558–60. When Buhler's implants were removed on December 6, 1990, the surgeon noted that they were worn and fragmented. Buhler has since undergone numerous surgical procedures to correct his TMJ problems and he continues to suffer physical symptoms and emotional anguish as a result of the failure of the Proplast implants.

Rynders and Buhler tried their products liability claims against DuPont to a jury on theories of breach of the implied warranties of merchantability and fitness for a particular purpose, strict liability and negligence. The district court entered judgment as a matter

of law dismissing the breach of implied warranty claims at the close of the evidence. The court held that "[t]here is no reliance by Vitek on Du Pont's manufactured product, and there—in addition, there is a disclaimer. Now, the presence of a disclaimer is not in itself sufficient I don't believe, but it is a factor the Court has examined." Transcript at 825. The court instructed the jury on strict liability and negligence, and the jury returned verdicts for DuPont on these claims.

## II. DISCUSSION

### A. Breach of Implied Warranties

■ We apply the same standard to the judgment as a matter of law dismissing the breach of warranty claims as the district court; we resolve all factual disputes in favor of Rynders and Buhler, the nonmoving parties, and reverse if reasonable jurors might differ as to the conclusions that could be drawn. *Thornton v. First State Bank,* 4 F.3d 650, 652 (8th Cir.1993). We review the district court's determination of South Dakota law de novo. *Salve Regina College v. Russell,* 499 U.S. 225, 111 S.Ct. 1217, 113 L.Ed.2d 190 (1991).

Rynders and Buhler contend that the district court misinterpreted South Dakota law when it found DuPont's disclaimers, combined with Vitek's lack of reliance on Du Pont's skill and knowledge regarding Teflon, sufficient to extinguish their implied warranty claims. They suggest that in order to dismiss their claims, the court read a privity requirement into the Uniform Commercial Code (U.C.C.) that does not exist under South Dakota law. According to Rynders and Buhler, regardless of whether Vitek would have a cause of action for breach of implied warranties under these circumstance, Rynders and Buhler have a cause of action under South Dakota Codified Laws 57A–2–318 ("2–318") as third-party beneficiaries of warranties implied in the sales contract between DuPont and Vitek. We disagree.

Rynders and Buhler are clearly correct that there is no privity requirement for recovery on implied warranty theories in South Dakota. *Cundy v. International Trencher Serv., Inc.,* 358 N.W.2d 233, 240 (S.D.1984) ("'lack of privity is no defense in South Dakota in a breach of implied warranty action by a remote buyer against a manufacturer'") (quoting *Horizons, Inc. v. Avco Corp.,* 551 F.Supp. 771, 777–78 (D.S.D.1982), *modified on other grounds,* 714 F.2d 862 (8th Cir.1983)). They are mistaken, however, in their contention that the modification or exclusion of warranties between the buyer and the seller has no effect on third-party beneficiaries to the contract.

■ The statute which gives rise to Rynders and Buhler's warranty claims provides:

A seller's warranty whether express or implied extends to any person who may reasonably be expected to use, consume or be affected by the goods and who is injured by breach of the warranty. A seller may not exclude or limit the operation of this section.

S.D. Codified Laws Ann. § 57A–2–318. In effect, the statute places third-party beneficiaries, who can be reasonably anticipated, in the shoes of the buyer for purposes of enforcing any warranties the seller has made. The words of the statute presuppose, however, the existence of a warranty, either express or implied.

■ We are confident, based on our review of the record, that DuPont made no implied warranty of fitness for a particular purpose to Vitek. S.D.Codified Laws Ann. § 57A–2–315 ("2–315").[4] DuPont advised Homsy of negative research regarding PTFE Teflon implants and expressly disavowed any firsthand knowledge of Teflon's suitability for medical uses. Homsy's response to DuPont's warnings and his subsequent actions demonstrate that Vitek did not rely on DuPont's skill or judgment for its assessment of the

**4.** S.D. Codified Laws Ann. § 57A–2–315 provides:

Where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is unless excluded or modified under § 57A–2–316 an implied warranty that the goods shall be fit for such purpose.

medical value of Teflon.[5] Homsy undertook to research and develop Proplast implants, and to pursue patents and FDA approval for the surgical use of Proplast. At the time of contracting, DuPont had no reason to suspect that Vitek was relying on its skill or judgment to select Teflon for use in Proplast, and Vitek did not in fact rely on DuPont. Thus, no warranty of fitness for a particular purpose could be implied under section 2–315.

Furthermore, to make the parties' relationship perfectly clear, DuPont required the Methodist Hospital purchasing agent to sign a disclaimer stating "we [DuPont] will provide you with material that you are ordering and such 'Teflon' as you order in the future only on the understanding that you assume full responsibility for any consequences which may result directly or indirectly from its use." Appellants' Appendix at A–202. Warranties implied in sales contracts may be modified or excluded. S.D. Codified Laws Ann. § 57A–2–316 ("2–316"). And, "[t]o the extent that the contract of sale contains provisions under which warranties are excluded or modified ... such provisions are equally operative against beneficiaries of warranties under [section 2–318]." U.C.C. § 2–318. Comment 1 (1990). The proviso to section 2–318, which states that "[a] seller may not exclude or limit the operation of this section," prohibits the seller from establishing a contractual privity requirement; it does not limit the seller's ability to modify or exclude warranties under section 2–316. *Id.*

■ Many states have steered a restrictive course against disclaimers of implied warranties under the U.C.C. South Dakota requires disclaimers to set out with particularity the characters of fitness being waived, demands strict compliance with the language of section 2–316, and has indicated that disclaimers must be explicitly negotiated between the buyer and the seller. *See Husky*

*Spray Serv., Inc. v. Patzer,* 471 N.W.2d 146, 151 (S.D.1991) (Supreme Court of South Dakota applying North Dakota law). Even if a disclaimer meets these stringent requirements the court may find it unconscionable as a matter of law and therefore unenforceable. S.D. Codified Laws Ann. § 57A–2–302 ("2–302"); *see Schmaltz v. Nissen,* 431 N.W.2d 657, 661–63 (S.D.1988); *Durham v. Ciba–Geigy Corp.,* 315 N.W.2d 696, 700–01 (S.D.1982).[6]

■ The district court was satisfied that DuPont's disclaimer in this case met the high standards of South Dakota law. We agree. Homsy's letter to DuPont clearly waives any implied warranty of Teflon's fitness for medical uses and demonstrates that the parties negotiated the waiver and included it in their contract for sale. Rynders and Buhler do not contend that the disclaimer was unconscionable. In any event, our review of the record indicates that the disclaimer in this case presents the type of bargained for allocation of risk between sophisticated parties that the South Dakota courts would uphold. *See Golden Reward Mining Co. v. Jervis B. Webb Co.,* 772 F.Supp. 1118 (D.S.D.1991) (upholding limitation of remedy under S.D. Codified Laws § 57A–2–719(3)). Rynders and Buhler have not demonstrated that DuPont was in any better position to determine the safety and efficacy of Proplast than Vitek. Therefore, the district court was correct to conclude that no warranty of fitness for a particular purpose could be implied, both because Vitek did not rely on DuPont's skill and knowledge and because DuPont had disclaimed the warranty. Accordingly, we find no error in the district court's dismissal of Rynders and Buhler's derivative implied warranty of fitness for a particular purpose claims.

DuPont's disclaimer was arguably ineffective to exclude the implied warranty of mer-

---

5. Rynders and Buhler argue that DuPont's March 13, 1967, letter did not bind Homsy, the president of Vitek, because it was addressed to Methodist Hospital. We note, however, that the letter bears a notation that a carbon copy was sent to Homsy. Homsy's response assures us that Homsy had actual knowledge of the contents of DuPont's letter and accepted full responsibility.

6. *Schmaltz* relied on *Hanson v. Funk Seeds Int'l,* 373 N.W.2d 30 (S.D.1985), which was subsequently abrogated by the legislature in Chapter 410 of the 1986 Session Laws. There is no indication in the Session Laws, however, that the legislature intended to abrogate the principle of unconscionability as it applies to disclaimers under section 2–316 in South Dakota.

chantability. Although implied warranties of fitness for a particular purpose may be excluded by general language, U.C.C. § 2–316 Comment 4 (1990), "[t]he warranty of merchantability ... is so commonly taken for granted that its exclusion from the contract is a matter threatening surprise and therefore requiring special precaution." *Id.* § 2–314 Comment 11. Notwithstanding the fact that "other language which in common understanding calls the buyer's attention to the exclusion of warranties and makes plain that there is no implied warranty" should be sufficient to exclude the warranty of merchantability, S.D. Codified Laws Ann. § 57A–2–316(3)(a), the South Dakota courts have strictly construed the requirements in section 2–316(2) that any attempt "to exclude or modify the implied warranty of merchantability ... must mention merchantability and in case of a writing must be conspicuous." S.D. Codified Laws Ann. § 57A–2–316(2); *Pearson v. Franklin Lab., Inc.*, 254 N.W.2d 133, 141 (S.D.1977). South Dakota courts have also found some attempted exclusions of warranties of merchantability unconscionable. *E.g., Schmaltz*, 431 N.W.2d at 661–63; *see supra*, note 6. We are not convinced when personal injury is involved that the language in DuPont's disclaimers satisfies South Dakota's requirements for exclusion of an implied warranty of merchantability. However, this determination does not end our inquiry.

■ The implied warranty of merchantability requires that goods be "fit for the *ordinary purposes* for which such goods are used." S.D. Codified Laws Ann. § 57A–2–314(2)(c) (emphasis added). Rynders and Buhler contend that any *intended* purpose for Teflon is an *ordinary* purpose under the statute.[7] We find no support for this position in the law. The warranty of merchantability generally promises that "the goods will conform to the ordinary standards and are of average grade, quality, and value of like goods which are generally sold in the stream of commerce." Alphonse M. Squillante &

John R. Fonseca, *Williston on Sales* § 18–5 at 67–68 (4th ed. 1974 and 1993 supplement); *see also* U.C.C. § 2–314 Comment 2 (1990) (goods "must be of a quality comparable to that generally acceptable in that line of trade").

■ DuPont offered evidence at trial of the many industrial uses for Teflon. Indeed, DuPont repeatedly warned Vitek that Teflon was ordinarily used for industrial purposes. It is clear to us that Vitek's experimentation and use of Teflon in human implants was an extraordinary use. To hold otherwise would confuse the distinction between the warranties of merchantability and of fitness for a particular purpose. Rynders and Buhler proffered no evidence that the Teflon used in their implants was of inferior grade or in any way unlike Teflon sold for its ordinary uses. Accordingly, the district court appropriately dismissed the implied warranty of merchantability claims.[8]

## B. Jury Instructions

■ Rynders and Buhler also challenge the district court's instructions to the jury in several regards. We will not reverse on the basis of jury instructions if the instructions, "as a whole, adequately and sufficiently state the law applicable to the case." *Sterkel v. Fruehauf Corp.*, 975 F.2d 528, 531 (8th Cir. 1992). As previously indicated, we review the district court's determinations of South Dakota law de novo.

### 1. Strict Liability

Rynders and Buhler contend that the district court's instructions on the strict liability theories of design defect and failure to warn were inadequate because they (1) misidentified the ultimate consumer for purposes of Restatement (Second) of Torts § 402A (1965) ("Restatement") as Vitek instead of Rynders and Buhler; (2) did not permit the jury to hold DuPont liable for Vitek's foreseeable

---

7. Rynders and Buhler's proposed jury instruction on the warranty of merchantability reads:

    A manufacturer impliedly warrants that its product is fit for use for the ordinary purpose *for which it was intended at the time of its sale.* Appellants' Brief at 18 (emphasis added).

8. DuPont also argued on appeal that both implied warranty claims failed for lack of notice and that they were barred by the statute of limitations. In light of our holding on the merits, we need not address these issues.

misuse of Teflon and (3) stated that DuPont was not liable under failure to warn theories if it gave adequate warnings to Vitek. We have reviewed the strict liability instructions and conclude that, taken as a whole, they adequately and sufficiently state the law of South Dakota.

■ Section 402A of the Restatement expresses South Dakota's rule of strict liability. *Peterson v. Safway Steel Scaffolds Co.,* 400 N.W.2d 909, 912 (S.D.1987). Section 402A provides, in pertinent part:

One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer.

Restatement § 402A(1). Three classes of defects are actionable under strict liability: "manufacturing defects where individual products within a product line are improperly constructed, design defects involving the entire product line, and defect by failure to properly warn or instruct users of a product where such failure renders the product hazardous." *Peterson,* 400 N.W.2d at 912 (emphasis omitted). Rynders and Buhler allege the last two.

The Restatement takes no position generally on the liability of a manufacturer to an ultimate consumer for a design defect when the product is expected to and does undergo further processing or other substantial change after it leaves the hands of the manufacturer and before it reaches the ultimate consumer. Restatement § 402A Comment P. "The question is essentially one of whether the responsibility for discovery and prevention of the dangerous defect is shifted to the intermediate party who is to make the changes." *Id.*

■ The district court decided that under the facts of this case, South Dakota would shift the burden of discovery and prevention of defects in the Proplast implants to Vitek. We agree. Rynders and Buhler, as previously indicated, do not claim that the Teflon

used in their implants was defective or unreasonably dangerous as originally delivered to Vitek. They claim that Teflon, as incorporated in Proplast, is an inappropriate substance to place in the human body. This is a claim within the peculiar knowledge of Vitek. It would be unreasonable and impractical to place the burden of testing and developing all devices that incorporate Teflon as a component on DuPont. *See Crossfield v. Quality Control Equip. Co.,* 1 F.3d 701, 703–04 (8th Cir.1993); *Childress v. Gresen Mfg. Co.,* 888 F.2d 45, 49 (6th Cir.1989). Indeed, federal law places the burden of gaining FDA approval for and registration of medical devices on the medical device manufacturer (Vitek), not the manufacturer of component parts (DuPont).[9] 21 C.F.R. §§ 807.20(a); 807.65; 807.81(a). Similarly, Vitek, not DuPont, was obligated to seek approval for Proplast's labels and warnings. *See id.* Accordingly, we hold that the district court appropriately limited DuPont's duties in the jury instructions.

### 2. Negligence

Finally, Rynders and Buhler challenge the district court's jury instructions on their claims that DuPont negligently continued to sell Teflon to Vitek knowing of Vitek's dangerous misuse and that DuPont negligently failed to warn the ultimate users of Proplast's dangers. The court instructed the jury that DuPont was liable under a negligence theory if:

1. Defendant Du Pont knew or had reason to know that its product was likely to be dangerous when used by Vitek in the manufacture of the TMJ implant [and]

2. Du Pont had no reason to believe that Vitek would realize the dangerous condition of the product when used in the TMJ implant [and]

3. Du Pont failed to exercise reasonable care to inform Vitek of the danger associated with the use of its product [and]

4. The negligence of Du Pont was the proximate cause of the plaintiffs' injuries and damages.

**9.** The district court instructed the jury that "as a matter of law ... there was no duty on the part of Du Pont to have conducted its own testing of the use of teflon in a TMJ implant." Appellants' App. at A–99.

Appellants' App. at A–97. In light of our discussion of DuPont and Vitek's respective duties to research and to warn about possible dangers associated with the Proplast implants, we hold that the court's instructions adequately state South Dakota law. We further hold that the district court appropriately denied an instruction on Rynders and Buhler's contention that DuPont negligently failed to discontinue sales of Teflon to Vitek for use in an FDA approved medical device.

## III. CONCLUSION

For the reasons discussed above, we affirm the judgment of the district court.